# EXHIBIT 1

```
                                                                   1
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x   11 CV 5201 (DLC)
 2                                           11 CV 6188 (DLC)
 3   FEDERAL HOUSING FINANCE AGENCY,         11 CV 6189 (DLC)
 3                                           11 CV 6190 (DLC)
 4              Plaintiff,                   11 CV 6192 (DLC)
 4                                           11 CV 6193 (DLC)
 5         v.                                11 CV 6195 (DLC)
 5                                           11 CV 6196 (DLC)
 6   JPMORGAN CHASE & CO., INC., et al.,     11 CV 6198 (DLC)
 6                                           11 CV 6200 (DLC)
 7              Defendants;                  11 CV 6201 (DLC)
 7                                           11 CV 6202 (DLC)
 8                                           11 CV 6739 (DLC)
 8                                           11 CV 6203 (DLC)
 9   And other FHFA cases.                   11 CV 6739 (DLC)
 9                                           11 CV 7010 (DLC)
10                                           11 CV 7048 (DLC)
10   ------------------------------------x
11
11                                           New York, N.Y.
12                                           October 15, 2012
12                                           2:30 p.m.
13
13   Before:
14
14                    HON. DENISE COTE,
15
15                                           District Judge
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

```
                                                                   61
 1   gave me, are you talking about the defendants collectively?
 2            MR. WOLL:  Yes.
 3            THE COURT:  Thank you.
 4            MR. WOLL:  I'm sorry, your Honor.  Excluding loan
 5   files.
 6            THE COURT:  So Ms. Chung, is it helpful to think about
 7   the post-closing period for a reduced number of custodians,
 8   searches during the five-year period for a limited number of
 9   custodians of each institution?
10            MS. CHUNG:  Your Honor, we did propose that along the
11   way.  We would like to argue this, your Honor, with your
12   permission.  I want to address particularly two things that
13   your Honor just heard.  One, these are really the most
14   important documents in the case.  It was later in the time
15   period, especially after the mortgage crisis hit, that people
16   began talking about -- and saw public and privately that the
17   performance was failing -- that people began writing e-mails
18   about what the problems in origination process had been.  So I
19   think it's exactly understating the importance of this category
20   of documents to say, well, it's limited to these subsets so
21   this is really not a big deal, you have enough documents.  So I
22   want to address the relevant particularly, but also what your
23   Honor had proposed, which is, doesn't it seem logical that some
24   subset would do.  And I embrace that, your Honor.  The letter
25   that they attach as Exhibit B to their letter to your Honor was
```

                                                                   62
 1    a proposal that we made in July saying, here's a proposal from
 2    us, since we've been talking about time frames, we don't seem
 3    to be making much progress, let's consider a post-closing world
 4    and a pre-closing world.  And in the three months since then,
 5    your Honor, what's happened is, FHFA has 111 custodians, and
 6    our post-closing world is 66 custodians.  We are now reviewing
 7    2.8 million documents just in the post-closing period.  And
 8    why?  Because I can't stand in front of your Honor and say that
 9    it's not relevant.  It's relevant.  You've heard them make the
10    arguments about GSEs came to these realizations.  We need to
11    know what they know.  Well, we agree with that.  So we're
12    searching seriously in this post-closing period.  Their
13    numbers, when Mr. Woll says, well, we have subsets, seven of
14    the defendants have nominated one or zero custodians in the
15    time period.  So whatever searches they're doing, they're
16    reaching -- and their custodian numbers overall are much lower
17    than ours, with the exception of JP Morgan and UBS -- I want to
18    be careful to make some distinctions.  They have significant
19    numbers of custodians.  But we're talking about almost all
20    defendants have less than 50 custodians to begin with.  And the
21    range of post-closing custodians they're searching is from 0 to
22    15.
23              So, your Honor, when we proposed that we could think
24    about, let's think about this, let's split the world, and then
25    we had multiple meet-and-confers about what that world would
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    63
 1   look like, what we found is, we're getting dribs and drabs on
 2   specific topics, exactly the ones Mr. Woll mentioned.  So
 3   repurchases, some, not all defendants have agreed to nominate
 4   repurchase custodians.  This is critical information, because
 5   as the banks got repurchased and evaluated them -- so these are
 6   loans that are being put back because somebody realizes there
 7   is something wrong with them -- when they write e-mails about
 8   those repurchases or they're applying standards about whether
 9   the guidelines meet them and what they are going to agree
10   that's a properly repurchased loan, that is a whole -- that's
11   everything on what they believe the guidelines mean.  And so,
12   yes, we're looking for that information.
13             And we're getting from some defendants, we'll give you
14   one or two people on that.  We don't have a good way to get
15   behind what the nominations are.  But we've also had defendants
16   tell us, we don't have anybody who did any of these things, we
17   don't have anybody who did monitoring of the performance, not
18   just the public monitoring but the reaction to the public
19   monitoring -- gee, do you see what that bond is doing, that's
20   something that we never expected would happen, what do we think
21   is going on.  And we know from the media reports and
22   allegations in the complaint that what's going on there is, you
23   will see e-mail traffic of people saying, well, we knew that
24   they were doing things they shouldn't be doing.
25             But I want to be clear, it's not just about knowledge
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
                                                                    64
 1   of falsity.  All of this information goes to falsity.
 2   Departures from the underwriting guidelines are the heart of
 3   the case.  And the search terms that we're talking about are
 4   things like the name of the underwriter, plus "abandon," plus
 5   "departure," plus "guidelines."  So if you're not running that
 6   search any time past 2007, which is what half of the defendants
 7   are doing, then it's giving FHFA a null set.  OK.  In that
 8   period, the meaning of a repurchase -- repurchase didn't start
 9   going seriously until 2009.  So saying that you're going to do
10   your searches up to 2007 or 2008 is offering FHFA exactly zero.
11   It's a false offer.
12             So, your Honor, what we have done is, in this long
13   process, I think -- and this is why I started with, I agree
14   that some of the defendants are -- they're not all perfectly
15   situated, but I think also there's just not a meeting of the
16   minds on this idea that -- we're not talking about one or two
17   people.  You have to seriously go and look at who worked on
18   repurchases.  Not a single defendant has offered anything on
19   this category that Mr. Wilson can understand, which is the
20   retrospective reviews.
21             Another thing that happened after the mortgage crisis
22   hit is that all these banks, the GSEs, everybody, took a step
23   back and many of their risk committees, the very highest
24   echelons of these banks and entities said, why did this go
25   wrong, where did we abandon our risk policies, and anybody who
```

```
                                                                    65
 1   was in these litigations knows that the parties on all sides
 2   have these reports.  These may not be ordinary custodians.
 3   This is not going to be the trader.  This is going to be some
 4   special theater or the highest people who were looking at risk
 5   in the institution.  And so it takes some diligence to figure
 6   out who these people are.  And what we found in our
 7   meet-and-confers was that diligence was not being exercised.
 8   When we are told there's nobody in the post-closing period that
 9   is relevant, that is very, very difficult for us to accept even
10   if it's also hard for to us attack.
11            And so, your Honor, I think what we ultimately
12   defaulted to, because we just found that we were not making
13   headway on this, is, OK -- no one is saying, by the way, during
14   these meet-and-confers, nobody said this was not relevant.  I
15   think we all understand it's relevant.  What we're hearing is,
16   it's burdensome, OK.  So as I explained, FHFA has taken on the
17   burden.  Our view is, only one or two defendants gave us
18   figures on burden.  Those figures are AA.  I mean, when
19   somebody tells me, I got 2 million hits, well, you know, we got
20   2 million hits, but that means there are relevant things.  It
21   may take a while to go through it, but it's there.  So our
22   option was, you know what, if this is where we are, run the
23   terms, run the terms on everybody.  If certain people are
24   completely irrelevant, you won't have any hits on them.  So
25   that shouldn't be the issue.  And this is the way that we're
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                   66
 1   going to find what is some very, very meaty information that is
 2   highly relevant to the case.
 3            Given that we proposed this idea of the pre-closing
 4   and post-closing world, I think, your Honor, certainly one
 5   thing that we had a lot of problems with, in addition -- it
 6   sort of layers onto this problem -- is, we've made many
 7   requests.  FHFA two months ago supplied a list of defendants of
 8   all 111 custodians, what their title is, what their department
 9   is, what their role is.  And you can imagine that many of these
10   meet-and-confers in order to test the adequacy of the custodian
11   list and to test the adequacy of the custodian list for the
12   post-closing period, we're seeking information about what these
13   people did.  We asked the defendants for reciprocal
14   information.  And in many cases we didn't get it.  I had a
15   demonstrative, which unfortunately I can't show your Honor, but
16   what we depict is, we sent Credit Suisse, for example -- we
17   were on a meet-and-confer and they said, you know, well, what
18   information do you want, so what information don't you have.
19   We actually made a chart with 30 rows or so with all the
20   custodians, the name -- we filled in what we had.  And we left
21   question marks in the boxes we didn't have.  And we asked for a
22   limited description of the role so we would see what these
23   people are doing.  And what we got back was a partial amount of
24   that list in which the last column had been deleted, the
25   description of what the person does.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1              OK.  That in a nutshell is kind of the problem that
2   we've been having in probing the adequacy of the post-closing
3   period.  I want to be clear, the number that we have just don't
4   add up.  There is not a way that you don't have a single person
5   in the organization, just one person.  But if we were to go to
6   one system where we are denominating people, then I think at a
7   minimum what FHFA would need is more information to tell what
8   the list is because we have applied that backup route and it
9   also has not really worked.
10             I'm kind of reluctant to hand around a demonstrative
11  because they came in during the period and defendants haven't
12  had a chance to see them.  But I think that describes kind of
13  where we've been.
14             I would like to just answer -- the negotiating history
15  obviously is relevant.  The defense has raised it.  And as I
16  say, I raised the idea that we originally proposed pre- and
17  post-closing world.  We did raise with the defendants, I just
18  want to answer this, certainly in the meet-and-confers that I
19  was involved in, we raised with the defendants that we were
20  producing, because of this law enforcement negotiation for lack
21  of progress, that they just run all the custodian terms for
22  everybody.  And that is indeed, for example, in the instance
23  where we got numbers back on what the number of hits would be,
24  that is what the defendant did to try to demonstrate this, and
25  this is going to return a lot of documents, maybe not a

```
                                                              68
 1   shocking proposition to begin with.  But it's not true that
 2   this was first raised with defendants in the letter.
 3            Your Honor, I just would say a few things about the
 4   data so that your Honor has the full picture.  We have a few
 5   defendants who have offered a few repurchase custodians, which
 6   is not adequate.  We have some defendants who have offered
 7   nobody.  We have no defendant who has offered any custodian on
 8   these retrospective reviews.  And on performance or monitoring
 9   of performance, I would say, I think maybe half of defendants
10   have offered between zero and eight people on this topic.
11            THE COURT:  Mr. Woll.
12            MR. WOLL:  Can I just be heard on a couple of things,
13   your Honor.  First of all, on the repurchase documents, I just
14   wanted to mention this, FHFA has taken the position that all of
15   its internal repurchase documents are privileged, so they're
16   not going to be producing, as I understand it, any internal
17   repurchase documents.  And just as a point of clarification,
18   repurchase claims involve lots of things.  They don't just
19   involve the purchase and underwriting guidelines.  And so there
20   could be repurchase documents that we come up with that have
21   nothing do with underwriting guidelines.
22            In terms of relevance and the argument that it's not
23   just the state of mind but it's compliance with guidelines,
24   this information after the fact, well, the whole point of this
25   sample that the plaintiff has proposed where this
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

```
                                                                   69
 1   reunderwriting exercise has been discussed is, that's going to
 2   be a lot of focus on loans to determine whether they in fact
 3   complied with underwriting guidelines or not.  So, again, to do
 4   a huge e-mail review to see if somebody said something three
 5   years after fact about compliance with the date of the
 6   transaction I don't think is a particularly efficient way to
 7   go.
 8             And then finally, just with respect to details about
 9   the custodians, as far as I know, and I could stand to be
10   corrected, I don't think we got detailed information about the
11   FHFA custodians in terms of which ones they've decided have had
12   post-securitization responsibilities or how they made that
13   decision.
14             THE COURT:  Thank you.
15             So to the extent that -- most of these cases are
16   non-fraud cases.  There are only six of the 16, I think, that
17   have fraud claims in them.  And even the fraud claims, of
18   course, are enormously impacted by the Section 11 claims, the
19   straight misrepresentation claims.  And statements that the
20   defendants make which the plaintiffs would argue would be
21   admissions that there was a noncompliance with underwriting
22   guidelines or underwriting practices would take some of the
23   disputes potentially off the table here.  So I can certainly
24   understand the importance of having a meaty production for the
25   post-closing period.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

```
                                                                70
 1             And with respect to these four categories of topics
 2   outlined in the plaintiff's letters and which Mr. Woll
 3   addressed, it seems to me each of them is an appropriate ground
 4   for post-closing discovery.  It remains unclear to me, though,
 5   whether we need all custodians searched.  But I think the
 6   burden would be on the defendants to make a showing that a more
 7   limited search would be sufficiently productive.  It seems to
 8   me if executives, people with management responsibilities,
 9   people who are members of special committees and make reports
10   for the institution with fact finding about what happened, in a
11   way that could be binding on the defendants at trial or
12   certainly highly relevant to a jury's analysis of the defenses
13   that are being put forward at trial, they have to be searched.
14   So if a defendant doesn't want all the custodians searched for
15   the five-year period, then I think they have a responsibility
16   to create a custodian list that identifies the custodians by
17   title and role and with a sufficiently detailed description of
18   their jobs and responsibilities to make a showing that a search
19   of their e-mails for the post-closing period won't be likely to
20   produce or isn't sufficiently likely to produce productive
21   materials.
22             It seems to me in the post-closing period what we're
23   talking about would be -- and, Ms. Chung, I'm happy to hear
24   from you on this -- but I think what we're talking about in the
25   post-closing period is people with a high-enough responsibility
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                71
 1   within the organization that their knowledge and observations
 2   about these historical practices bear some weight, and that
 3   some of the more junior-level people, that would have highly
 4   relevant information during the periods of securitizations
 5   themselves, their stray comments or thoughts might be of less
 6   interest or importance in the post-closing period.  One could
 7   argue the other way.  But I think that defendants need to get
 8   to the plaintiff by the close of business tomorrow a list of
 9   their custodians by title and role and indicating which
10   custodians they do not believe there should a search for for
11   the post-closing period, so that there can be an adequate
12   meet-and-confer on that topic on Wednesday between the parties
13   and so Thursday afternoon I can address any areas of
14   disagreement.
15             With respect to the bubble --
16             MS. CHUNG:  Your Honor, I didn't really address that.
17   I don't know -- I could do it briefly.
18             THE COURT:  Ms. Chung.
19             MS. CHUNG:  It is a version of the same argument
20   because -- on this one I want to be clear, there's a clear
21   split in defendants.  I want to give credit; a lot of
22   defendants are not using this bubble approach.  For FHFA it was
23   never an issue because on our side, and one of the reasons --
24   it was funny when you said I didn't see it in the letter.  On
25   our side we don't have a bubble because we just ran all our
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                   72
 1   custodians pre-period for all deals and all originator terms.
 2   Most of our employees worked on the same deal so it didn't make
 3   a difference.  So our eye was not really on the idea that you
 4   would ever try to separate the originator terms by deal.  And
 5   so when defendants started doing that, and there's been some
 6   the movement in it but now I think it's clear there's sort of
 7   two camps.  One camp is searching it all the way through.  And
 8   another camp has said, no, we're always going to associate an
 9   the individual originator with the deal that they were welded
10   to.  And the problem with that, your Honor, again, is the
11   arbitrary cutoff of relevance.  It may be, you know, there are,
12   for example, there is an example in the -- I think it's Merrill
13   Lynch, where during the time period the deals are being done --
14   that's information that comes about in different RBS case
15   that's public because there has been motion practice about it,
16   so, oh, gee, this originator, looks a little weird, let's start
17   doing some quality control on this.  OK.  If that kind of thing
18   happens and they're looking for quality control in the
19   origination of the loans, that's not going to happen in a
20   four-month window.  So that's the logic, that it's just -- I
21   think it's hard to say that it's burdensome if the plaintiffs
22   are doing it and then there's this kind of arbitrary three
23   months before, one month after that we don't think bears any
24   relation to the relevance of the documents.
25            THE COURT:  Ms. Chung, with respect to that division
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

73

```
 1   between pre-closing and post-closing, where is that line drawn,
 2   in your view?
 3             MS. CHUNG:  In terms of what, your Honor?
 4             THE COURT:  An individual defendant.
 5             MS. CHUNG:  Well, I guess the distinction we drew,
 6   your Honor, is, we're not insisting -- we put the bubbles
 7   around what we've been calling the deal terms.  So there have
 8   been two sets of searches.  One is geared off of the actual
 9   securitization names and the CUSIPs and things like that.  That
10   to us is debatable.  Frankly, we could have asked this as well,
11   I think, but we didn't.  We said, OK, if you want to run the
12   deal terms in bubbles, that makes some sense because you expect
13   there to be higher volume about the deal when it's being
14   arranged.  But to us the originator information is not like
15   that.  There can be e-mail chatter about the originators and
16   their practices and perhaps the falsity of their
17   representations in the offering materials to the extent they're
18   talking about departures from the guidelines at any point in
19   time.  And so I guess what I'm saying is, much of the argument
20   for us is the same.
21             THE COURT:  But then you made the proposal of a pre-
22   and post-closing search and a distinction between the two.  For
23   any individual defendant, what is the demarcation for it?
24             MS. CHUNG:  Your Honor, it depended on what duties
25   they had.  So we were saying -- it's not unlike what your Honor
```


74

 1  was just saying.  If you can give us enough information that
 2  they only would have had e-mail traffic in an earlier period,
 3  so this might be people who are doing the arranging of the
 4  deal, so all they're doing is picking the loans that are going
 5  to go into the deal, that could have some logic to it, there's
 6  no need to go up to the date of the complaint from
 7  post-closing.  But that was exactly the kind of information
 8  that we found it difficult to get.
 9           I think the key thing was what your Honor identified,
10  which is -- because I think most of the defendants have already
11  staked out the position that if they're on the custodian list
12  and they haven't already been designated by them as a
13  post-closing custodian, that those people do not have duties
14  that would implicate those fewer areas.
15           I think what we're -- so we're very interested in the
16  first part of what your Honor ordered, which is, can you
17  identify people in these four buckets who -- have you
18  identified those people, if they are the higher-level people
19  that's fine -- who did have responsibility for these things.  I
20  think that's really what we've been missing.
21           THE COURT:  Do you agree that with respect to that
22  five-year period -- I'll call it the post-closing period --
23  that what is most important to the plaintiff are things that
24  could be thought of as admissions, that they are basically
25  things that were said to, heard by, or articulated by people in

```
                                                                    75
 1   managerial or executive positions with respect the
 2   organization?
 3            MS. CHUNG:  Yes.  Your Honor, I think we could make a
 4   broader argument.  It depends.  For example, on repurchases,
 5   many of these entities had, when repurchases started coming in
 6   in big volumes, they would form committees where there would be
 7   standards set.  There would even be things like, you know, I've
 8   seen a policy that said to employees, if you can find ways to
 9   turn down these repurchases, you'll get incentive-based pay.
10            So there can be a range of things that e-mail traffic
11   and -- you know, it can be at a committee level.  It can be at
12   the executives' level.  I understand what your Honor is saying
13   about having the importance to bind the company.  But I think
14   in many ways -- I mean, this is an argument defendants have
15   made -- that, you know, you're an employee and you're there and
16   that's still relevant information if you're talking about the
17   business and the aspects of the business that are relevant to
18   the case.
19            But I hasten to say, I think that a big issue has been
20   for us so far just identifying any people that relate to those
21   four buckets.  That's what the big hurdle has been so far.
22            THE COURT:  Mr. Woll.
23            MR. WOLL:  Yes.  Your Honor, I just wanted to add that
24   you instructed defendants to provide information about their
25   custodians and ones that are not appropriate for post-
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```